**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| **PAMELA SWANSON** ) | Civil Action No.: 2-03-3938-23 |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | |
| ) | |
| **BRIAN G. WIDENHOUSE, M.D., and** ) | |
| **PALMETTO PLASTIC SURGERY, P.A.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**PLAINTIFF'S MOTION FOR NEW TRIAL**

The Plaintiff by and through her undersigned counsel hereby moves pursuant to Rule 59 of the Federal Rules of Civil Procedure for a new trial.

**HISTORY**

This is a tort action for medical negligence. The Defendant Widenhouse and Defendant Palmetto, as medical doctors and providers, their agents and employees, owed Plaintiff a duty to use reasonable skill, care, and judgment in diagnosing Plaintiff's condition, in treating that condition, and in advising Plaintiff regarding that condition.  These Defendants, their agents and employees, breached this duty and failed to provide the level of care expected of a medical care provider and specialist in plastic and reconstruction medicine and surgical medicine.

The Plaintiff, Pamela Swanson, is a forty-nine (49) year old female, who was a physically active female until her surgery in November 2003, was routinely taking walks and participating in other physical activities, and was not having any medical problems.  As she was exercising

routinely, she believed that plastic surgery would assist her in those areas on her body not completely benefited by exercise alone.

On June 20, 2000, the Plaintiff had an appointment with Defendant Widenhouse at Defendant Palmetto and further discussed the augmentation/mastopexy surgery. At this time, Defendant Widenhouse again assured the Plaintiff that the discussed surgery was safe surgery. The Defendants did a surgical cost analysis for the augmentation/mastopexy surgery.

The Plaintiff again met with Defendant Widenhouse at Defendant Palmetto on July 24, 2000, to discuss breast enhancement, as the Plaintiff's left breast was larger than her right. During this meeting, Defendant Widenhouse also discussed the "sagging" of Plaintiff's breast and what could be done to correct it. Defendant Widenhouse stated he would not perform breast enhancement without a correction of the "sagging" breast as, in his opinion, they would not look right.

On November 16, 2000, she underwent breast augmentation/mastopexy surgery for her breasts. After the surgery, the Plaintiff was in excruciating pain but was discharged to go home at 8 p.m. The Plaintiff had a friend, Holly Wallace, drive her home.

This case involves negligence of the Defendants breast augmentation/mastopexy surgery on November 16, 2000. A trial was held beginning on February 6, 2006 and ending on February 8, 2006. After approximately five hours of deliberation, the Jury returned a verdict for the Defendant Dr. Brian G. Widenhouse that *ipso facto* resulted in a verdict for the Defendant Palmetto Plastic Surgery, P.A.

## GROUNDS FOR NEW TRIAL

The Plaintiff submits that the following are valid grounds for a new trial and are not harmless errors as described in Rule 61 FRCP, because they affect the substantial rights of the Plaintiff.

**A.  Juror**. Kenneth J. Lubbers should have been allowed to continue as a member of the venire or Jury pool. Mr. Lubbers was a member of the venire or Jury pool (Juror No. 109). In voir dire, Mr. Lubbers stated that a member of his family had been a Plaintiff in a medical malpractice case. The Defendants did not seek his disqualification at that time. Instead, Mr. Lubbers was selected as one of the 14 jurors chosen for peremptory strikes. Before the peremptory strikes however, counsel for the Defendants asked the Court to strike Mr. Lubbers for "cause" and counsel for the Plaintiff objected. The Court granted the request of the Defendants.

The Fourth Circuit in *U.S.A. v. Turner*, 389 F.3d 111 (4th Cir. 2004) emphatically rejected *per se* standards for juror disqualification: "We review challenges to the qualifications of jurors under an abuse of discretion standard.' *United States v. Jones*, 608 F.2d 1004, 1007 (4th Cir. 1979). It is the settled law of this circuit that a district judge retains a "very broad discretion in deciding whether to excuse a juror for cause and his decision will not be overturned except for manifest abuse of that discretion.' *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989); *See also*, Rule 47 and Wright & Miller, *Federal Practice and Procedure* §§ 2481-2485.

An abuse of discretion can be found in either of two ways. First, a district court abuses its discretion if it ignores a *per se* rule of disqualification after counsel moves to exclude a

venireman. Second, if the court demonstrates a clear disregard for the 'actual bias' of an individual venireman, reversal is justified. We consider both possibilities in turn.

'[U]nder our system it is [the trial] judge who is best situated to determine competency to serve impartially.' *Patton v. Yount*, 467 U.S. 1025, 1039 (1984). *Per se* rules of disqualification interfere with the trial court's administration of jury selection. Trials courts are expert at finding and applying facts, particularly in the conduct of a trial. *Per se* rules, by contrast, create situations in which no set of facts can allow the judge to utilize this expertise and discretion. This inverts our deferential standard of review. A list of *per se* exclusions 'would burden the courts needlessly with a responsibility of endless speculation on the presumptive bias of potential jurors.' *United States v. Brown*, 644 F.2d 101, 105 (2d Cir. 1981).

We have long refused to manage jury selection from the court of appeals through promulgating rules of automatic disqualification. In *Jones*, we reviewed a conviction for armed robbery of a bank under the same statute Turner violated. Jones challenged veniremen whose spouses worked at a bank or whose relatives had been bank robbery victims. But '[w]e decline[d] to establish a *per se* rule of disqualification where a juror is related to a victim of a similar crime.' *Jones*, 608 F.2d at 1008. In *United States v. Loucas*, 629 F.2d 989, 992 (4th Cir. 1980), we refused to direct district courts 'to strike jurors for cause because they have sat on prior similar cases.' In *Poynter*, we refused to 'adopt *per se* rules disqualifying potential jurors in medical malpractice lawsuits who are current patients of a defendant doctor or who are themselves defendants in a pending medical malpractice suit.' *Poynter*, 874 F.2d at 222.

In *Bright v. Coastal Lumber Co.*, 962 F.2d 365 (4th Cir. 1992), a lawsuit about coal mining

leases, we refused to create a *per se* exclusion even when the potential juror acknowledged the possibility of a 'subconscious bias' because the juror had a financial interest in a different coal mining lease lawsuit and was a friend of defendant's counsel. *Id.* at 367, 370. These facts did not require automatic disqualification, but were relevant circumstances for the district judge to consider when assessing the prospective juror's impartiality." *Id.* at 370. (Emphasis Added).

Proximity to another medical malpractice case is therefore not cause per se and it is clear therefore that the Court abused its discretion in applying a per se standard when it struck Mr. Lubbers as a potential juror.

**B.   The "Sleeping" Juror**. The plaintiff, Pamela M. Swanson, witnessed the "male black juror" in the back row sleeping most of the first day of the trial. The only African-American on the jury was Jerry Herbert Williams, Sr., Juror No. 197. This was witnessed during the testimony of the following witnesses: Cathy Currier, Deposition of James Heaslip read by David Popowski, Attorney for the Plaintiff, and Dr. John Baeke, expert witness for the Plaintiff. With such conduct, he could not make an informed decision nor could a unanimous verdict be formed. *Robinson v. Cattaraugus County*, 147 F.3d 153, 161 (2nd Cir. 1998); *See also* Rule 48. (Affidavit of Pamela Swanson).

A second witness, Cathy Currier, noticed a similar problem with Juror No. 197. During the first day of trial she was sitting in the front row watching the trial and noticed the black juror in the back row had his eyes closed for lengths of time. She is a nurse and works all shifts and wondered if he had just got off the night shift working. Additionally, she thought he made attempts to pay attention but appeared to be physically fatigued and unable to focus. *Id.*

(Affidavit of Cathy Currier).

Characteristics of a juror is to be scrutinized includes not only spoken words, but gestures and attitudes in order to ensure the jury's impartiality and competence. *Harris v. Folk Construction Co.*, 138 F.3d 365, 371 (8th Cir. 1998). With this juror sleeping, being physically fatigued and unable to focus, there could be no unanimous verdict in this trial.

It is imperative that jurors are attentive throughout the entire trial in order to have a fair and just verdict. Herein, the court sat more than six jurors to satisfy the Seventh Amendment that a minimum size of a jury must be six. *Ballew v. Gerogia*, 435 U.S. 223 (1978). This is because the institution of alternate jurors was abolished by the revision of Rule 47.

If the Court takes the precaution of seating a jury larger than six, eight in this case, a possible illness occurring during the deliberations period would not result in a mistrial, as it did formerly, because all jurors would participate, again as they did in this case, in the verdict and a sufficient number would remain to render a unanimous verdict of six or more. *Ray v. Parkside Surgery Center*, 13 F.R. Serv. 585 (6th Cir. 1989); *See also*, Rule 48, Number of Jurors-Participation in Verdict. Again, with this juror sleeping, being physically fatigued and unable to focus, there simply would be no way a unanimous verdict by all jurors was reached in this trial as this juror could not and did not fully participate during the trial and witness testimony.

Finally, as there was what accounted to misconduct by this juror, the plaintiff was denied her right to a jury trial as required by Rule 39.

**C.   Permitting Drs. Hagerty and DeVito to Testify**. Dr. Richard C. Hagerty and Dr. Peter C. DeVito were physicians that the Plaintiff consulted, that examined her, and whom she asked

to act as experts for her in this case. This suit was filed in state court and removed to this Court on December 12, 2003. According to the Second Amended Conference and Scheduling Order, the Defendants were to name their experts on January 17, 2004. These doctors were not named as expert witnesses until October 11, 2005 by a Second Supplemental Expert Witness Disclosure. Initially, following a Motion in Limine by the Plaintiff, the Court by Order dated October 13, 2005 ruled that they would not be allowed to testify. The original trial date of October 17, 2005, was then continued. The Defendants subsequently filed a Motion for Amended Conference and Scheduling Order on October 2005 that merely asked for the extension of the discovery deadlines. The Plaintiffs opposed the Motion. The Defendants did not file a Motion for Reconsideration of the Court's ruling regarding the doctors. On December 21, 2006, at the Pre-Trial Conference, the Court reversed itself and allowed the doctors to testify. The Court then denied the Motion for Reconsideration by the Plaintiff. The Plaintiff, at trial, renewed her motion to strike the testimony of Drs. Hagerty and Dr. DeVito relying, among other things, on the recent decision of the United States Court of Appeals for the Seventh Circuit in *Musser v. Gestiva Health Services*, 356 F.3d 751, 756-760(7th Cir. 2004) where the court stated that the formal disclosure of expert witnesses under Rule 26(a)(2)(A) is demanded and not pointless; and further must not be late beyond a "trivial" amount of time. By reversing itself on December 21, 2005, and allowing the doctors to testify at trial set for February 6, 2006, the Court altered the character of the case at the eleventh hour. If the Court had disallowed the testimony of Drs. Hagerty and DeVito, then the playing field would have been level, i.e. Plaintiff had named as an expert witness, Dr. John Baeke, and the Defendants had initially named as their expert witness

as Dr. James Wallace, both of whom testified at trial. Instead, the Court prejudiced the Plaintiff by allowing the Defendants to "pile on," permitting Drs. Hagerty and DeVito to testify adversely to the Plaintiff when the Plaintiff at her own initiative had consulted them to be her experts.

Allowing their testimony also violated Rule 403 as their testimony was cumulative, confusing and its probative value was substantially outweighed by the unfair prejudice to the Plaintiff. *State v. Hess*, 279 S.C. 377, 301 S.E.2d 547, cert. denied, 464 U.S. 827 (1983). A party, such as the Plaintiff herein, does not even have to name an expert, i.e., DeVito and Hagerty, she is not going to use at trial to testify. See Rule 702.

Further, the Defendants did not name Dr. DeVito nor Dr. Hagerty as an expert witness in their Supplemental Answers to Plaintiff's First Set of Interrogatories to Defendants in their September responses, but were allowed to used them as their expert's in this case. Therefore, evidence sanction excluding the testimony of Peter C. De Vito, MD., and Dr. Hagerty pursuant to Federal Rule 37, is an appropriate remedy.

Rule 37(c) addresses failure to disclose and states in relevant part:

> (1) A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

The district court's determinations as to issue sanction was given latitude and was not an abuse of discretion to preclude as sanction new issue prejudicial to opposing party

and not previously related. *Southern States Rack and Fixture, Inc. v. Sherwin-Williams, Inc.*, 318 F.3d 592, 595 (4th Cir. 2003). Further, there is no requirement that failure to disclose be in bad faith to justify exclusion of evidence. *Id.* at 596.

It is proper for the court to suppress medical evidence not discovered or turned over until after the discovery deadline. *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 426 (4th Cir. 1996); see also, *Tenbarge v. Ames Taping Tool Sys., Inc.*, 190 F.3d 862, 865 (8th Cir. 1999) (court may exclude expert testimony not included in disclosure); *Harre v. Muegler*, 113 F.3d 909, 911 (8th Cir. 1997) (not an error to prevent party from presenting evidence not turned over during discovery); *Rabb v. Amatex Corp.*, 769 F.2d 996, 999 (4th Cir. 1985) (willful disregard of discovery timetable warranted exclusion of critical evidence). *Basch v. Westinghouse Elec. Corp.*, 777 F.2d 165, 175 (4th Cir. 1985) (expert barred from testifying due to improper response to interrogatory). *Davis v. Marathon Oil Co.*, 528 F.2d 395, 403 (1976) (appropriate to preclude "eleventh hour" witness).

**D.     Common Knowledge – Jury Instruction**. The Court disallowed the "common knowledge" Jury instruction that is as follows:

I CHARGE YOU THAT:

Because many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge and experience, expert testimony is generally necessary under our law. A witness who has special knowledge, skill, experience, training or education in a particular field, profession or occupation may give his opinion as an expert once that witness has been qualified as [stipulated as] an expert.

The general rule is that expert testimony is required in a malpractice case to show that the defendant failed to conform to the required standard. The question of whether a physician, in making a diagnosis or finding, deviated from the applicable standard of care, either by not employing a particular procedure or by not ordering a particular test, is to be determined by what an ordinary, careful, and prudent physician would have done under the same or similar circumstances. A physician is only required to meet the standard of skill possessed by an ordinary, careful and prudent practitioner in his field under the same or similar circumstances. There is an exception to the expert testimony requirement in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts. Accordingly, in a medical malpractice action, the plaintiff must establish by expert testimony both the required standard of care and the defendant's failure to conform to that standard, unless the subject matter lies within the ambit of common knowledge or experience, so that no special learning is needed to evaluate the defendant's conduct. When expert testimony is the only evidence of proximate cause relied upon, it must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection.

You must determine the standard of professional learning, skill, and care required of the defendant only from the opinions of the physicians (including the defendant) who have testified as expert witnesses as to such a standard. You must not attempt to determine this question from any personal knowledge you have, for the plaintiff is required to use expert testimony to establish recognized practices and procedures if the matter is within the special

knowledge or expertise of medical practitioners.

Because it was clear was clear from the photographs in this case that corrective surgery was necessary following Dr. Widenhouse's surgery on the Plaintiff, the Court on its face should have allowed this instruction. Rule 701 allows such testimony when they (a) are rationally based on the perception of the witness, (b) are helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) do not require special knowledge, skill, experience or training. The photographs entered into evidence met all of the rule 701 requirements; and the jury was the trier of fact regarding the photographs pursuant to Rule 1008.

**E.     Dates of Photos**. At the close of the case, during Jury deliberations, the Court incorrectly supplemented the record over the objection of the Plaintiff by attaching specific dates to various pictures that were entered into the record without such dates.

In *United States v. Prime*, 431 F.3d 1147 (9th Cir. 2005) the Court stated: "A defendant is entitled to a new trial when the **jury** obtains or uses evidence that has not been introduced during trial if there is 'a reasonable possibility that the extrinsic material could have affected the verdict.' *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir. 1988) (quoting *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979)). Therein, the Court held the prosecution bears the burden of proving beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. *Id*. at 405-06.

In *Dickson*, we developed a five-factor approach to determine whether the prosecution met this burden. Those factors are: 1) whether the material was actually received, and if so, how;

2) the length of time it was available to the **jury**; 3) the extent to which the jury discussed and considered it; 4) whether the material was introduced before a verdict was reached, and if so at what point in the **deliberations**; and 5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. *Id*. at 406. The fifth factor includes consideration of the nature of the extrinsic evidence. *Keating,* 147 F.3d at 902.

In *Jeffries v. Wood*, we expanded upon the Dickson factors, and introduced several other factors that should impact our consideration of the extrinsic evidence in this case, including: "whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; whether a curative instruction was given or some other step taken to ameliorate the prejudice; the trial context [including consideration of the *Dickson* factors]; and whether the statement was insufficiently prejudicial given the issues and evidence in the case."

Here in this case, Plaintiff submits that the Court's action affected the verdict.

## CONCLUSION

For the forgoing reasons, this Court should grant a new trial.

Respectfully submitted,

S/James L. Bell
James L. Bell (Fed. Id No. 1281)
The Bell Law Firm, P.A.
P.O. Box 778
Charleston, SC 29402-0778
Phone: 843-723-3262
Email: lawbellsc@yahoo.com

                                              S/ David Popowski
                                              David Popowski (Fed. Id No. 3097)
                                              Attorney at Law
                                              171 Church Street, Suite 110
                                              P.O. Box 1064
                                              Charleston, SC 29402
                                              Phone: 843-722-8301
                                              Facsimile: 843-722-8309
                                              Email: lawdpop@aol.com

                                              ATTORNEYS FOR THE PLAINTIFF

February 21, 2006
Charleston, South Carolina